UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| KEISHA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 24-019-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| EASTERN KENTUCKY UNIVERSITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Eastern Kentucky University's ("EKU") Motion for Summary Judgment on Plaintiff Keisha Williams' remaining claims. [Record No. 43] Williams, proceeding *pro se*, did not respond to the present motion within the time provided by the Local Rules. Notwithstanding that failure, the undersigned has examined the motion and concludes that the defendant has met its burden under Rule 56(a) of the Federal Rules of Civil Procedure regarding the following claims: failure to hire for the Digital Engagement Officer position, failure to hire for the Associate Director of Advising & Career position, failure to promote to higher positions or projects, unequal terms of employment, retaliation, and hostile work environment. The defendant, however, has failed to meet its burden regarding plaintiff's wrongful termination claim because it seeks to apply an incorrect legal standard. Therefore, the motion will be denied regarding that claim.

### I. Background

Keisha Williams began her career as a Development Associate at EKU shortly after completing her Master of Business Administration in 2017. [*See* Record No. 43-7 at 11.]

Williams has work experience in the areas of development and marketing along with projects involving website development, Adobe Creative Suite, and MacIntosh templates and page layouts. *Id.* Williams' salary during her five-year tenure as Development Associate increased from $30,000 to $37,300 at the time of her discharge in 2022. [*See* Record Nos. 24 at 3, and 43-8 at 51.] The position summary stated:

> The Development Associate plays an important role in the long-term success of building a culture of philanthropy at Eastern Kentucky University. The Development Associate will work with the Director of Annual Giving to manage the annual fund phonathon program as well as establish and implement a student and young alumni philanthropy program. The essential responsibilities include: 1) setting and achieving fundraising goals within phonathon, student philanthropy and young alumni philanthropy, 2) managing phonathon student workers and participants, and 3) coordinating the above efforts with the overall annual fund program.

[Record No. 43-5 at 2] Williams indicated her race was "Black or African American" on EKU's self-report form. [*See* Record No. 43-8 at 50.]

In 2018, Williams made a claim of discrimination to EKU's Vice Provost for Diversity and Chief Diversity Officer regarding Ben Mohler, her former supervisor. [Record No. 1-1 at 7] The alleged improper action involved Mohler using a racial slur, creating a white supremacist gesture with his hands, and responding to a grammatical error on a shirt Williams had designed. [Record No. 43 at 20] Although Williams declined to open an official investigation, Mohler and Amy Foulkes (Williams' direct supervisor) left EKU shortly thereafter. [Record No 1-1 at 7]

While employed at EKU, Williams consistently received "Highly Effective" ratings on her annual evaluations. [Record No. 43-16 at 5] She briefly served as an Adjunct Business Professor, teaching courses in Principles of Marketing and Professional Development before her termination. [Record No. 43-28 at 2] While employed by EKU, she applied for the

following internal positions: Director of Annual Giving (2019), Marketing Professor Facilitator (2021), Business Professor Facilitator (2021), and Senior Programmer Analyst (2020). Williams, however, never received an interview. [Record No. 43-16 at 8] Williams spoke with her direct supervisor, Krista Rhodus, in 2019 and 2022, about increasing her responsibilities and the possibility of a promotion or title change. *Id.* Neither conversation resulted in any change to her pay grade, title, or position. *Id.*

In mid-2022, the Development department began to discuss reorganization plans to align fundraising efforts with industry's best practices, which included shifting from a call center approach to digital engagement strategies. [Record No. 43 at 2] To this end, Williams' Development Associate position was slated for elimination together with two other vacant positions. On October 7, 2022, EKU's Human Resources Business Partner met with Williams to advise of her termination and provide a letter explaining that Williams was eligible for re-employment by the University. *Id.* at 3 Williams received a copy of a Severance Agreement which included, among other things, the ability to "apply for an be considered an 'internal candidate' for job postings until October 7, 2023." *Id.* Williams never signed the Severance Agreement, however. *Id.*

Williams filed a charge with the Equal Employment Opportunity Commission ("EEOC") on May 11, 2023, alleging racial discrimination. [Record No. 1-1 at 1] After receiving a Notice of Right to Sue letter from the EEOC, Williams filed her *pro se* Complaint alleging claims of employment discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* [Record No. 1] Williams contends that the University failed to hire her, failed to promote her, retaliated against her, subjected her to unequal terms and conditions of employment, and terminated her employment based on her race, color, and

gender/sex. *Id.* This Court granted EKU's Partial Motion to Dismiss the claims alleged to have occurred before July 15, 2022, as well as those alleging discrimination based on color and gender/sex because they were either waived or outside the statute of limitations set forth in 42 U.S.C. § 2000e-5(e)(1). [Record Nos. 9 and 12]

## II.  Legal Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). But a dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. In reviewing a motion for summary judgment, the court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The court may not weigh the evidence or make credibility determinations but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

Although *pro se* pleadings are construed liberally, *pro se* litigants must nevertheless "follow the rules of civil procedure and easily-understood Court deadlines." *Stradford v. Cuyahoga Cnty.*, 2024 WL 22082, at *1 (N.D. Ohio Jan 2, 2024); *see also Akaazua v. Walker Novak Legal Grp.*, 2019 WL 2388096, at *1 (W.D. Mich. Mar. 6, 2019). Local Rule 7.1(c) allows twenty-one days to respond to a motion and states that "[f]ailure to timely respond to a motion may be grounds for granting the motion." That said, a plaintiff's failure to respond to a motion for summary judgment is not alone a reason to grant the motion. *Carver v. Bunch*,

946 F.2d 451, 455 (6th Cir. 1991). The movant's burden to demonstrate the "absence of a genuine issue as to a material fact" remains unchanged even when a non-movant does not respond. *Id.* at 454. Under those circumstances, the court will not "comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 410 (6th Cir. 1992). Instead, it "may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Id.*

### III. Analysis

To establish a claim of discrimination based on race, a plaintiff must present either direct or circumstantial evidence to support the claim. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003)). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Indirect evidence must show "circumstances which give rise to an inference of unlawful discrimination." *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 622 (6th Cir. 2024). When a plaintiff provides only indirect evidence, the claim is analyzed under the *McDonnell Douglas* burden-shifting approach. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (citing *Johnson v. Kroger*, 319 F.3d at 865–66).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged action. *Moore*, 113 F.4th at 622. If the defendant satisfies that burden, the burden shifts back to the plaintiff to show that

the proffered reason is pretext for discrimination. *Id.* at 623. The plaintiff can demonstrate the proffered reason is pretextual by showing it "'(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Clay*, 501 F.3d at 704 (quoting *Johnson v. Kroger*, 319 F.3d at 866). To survive summary judgment, the plaintiff must show that a "reasonable factfinder could find that the employer's proffered reason was insufficient to motivate the employee's discharge." *Moore*, 113 F.4th at 623 (citing *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008)) (cleaned up). The employer is entitled to summary judgment if the "'plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination . . . occurred.'" *Taylor v. Ingham Cnty. Cir. Ct.*, No. 23-1685, 2024 WL 3217590, at *4 (6th Cir. June 27, 2024) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) (additions in original).

There are several "'context-dependent ways by which plaintiffs may establish a *prima facie* case' of discrimination." *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (quoting *Clay*, 501 F.3d at 704). In the employment context, facts will vary meaning that the *prima facie* proof necessary for a claim will likewise vary. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007) *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 (2009) (internal citations omitted). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Blair*, 505 F.3d at 529 (internal citations omitted). The burden to establish a

*prima facie* racial discrimination claim is "not onerous." *Moore*, 113 F.4th at 622; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

## Wrongful Termination

To establish a *prima facie* case for wrongful termination, the plaintiff must demonstrate that he or she was "'(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees.'" *Moore*, 113 F.4th at 622 (quoting *Tennial*, 840 F.3d at 303). But for a termination claim "arising out of a work force reduction" or "workforce adjustment" the Sixth Circuit "has modified the fourth element to require that the plaintiff provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rachells*, 732 F.3d at 661 (internal citations and quotations omitted); *see also Blair*, 505 F.3d at 529; *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *King v. Healthrider, Inc.*, 194 F.3d 1312 (6th Cir. 1999) (applying same modification to sex discrimination claim); *Thompson v. Fresh Prods.*, LLC, 985 F.3d 509, 527 (6th Cir. 2021) (applying same modification to race discrimination claim); *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008) (noting the applicability of the elements in a reduction in force claim to a workforce adjustment claim). "A work force reduction . . . occurs when business considerations cause an employer to eliminate one or more positions within the company." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).[1] The fourth element

---

[1] The court further distinguished when an employee is eliminated as part of a workforce reduction rather than replaced in this way:

can be met by showing that a "comparable non-protected person was treated better." *Ercegovich*, 154 F.3d at 350 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)).

EKU argues that Williams' position and assigned duties were eliminated in the reorganization and not "replaced." [*See* Record No. 43 at 6–7 ("The position of Development Associate was eliminated and has not been reestablished under any title or filled since her separation.").] Referencing Williams' unchanged job description from when she was hired in 2017, EKU argues that her position was eliminated because phone-based fundraising was no longer viable in the context of the increasingly digitized world. *Id.* at 2. However, in proving its point—it applies the wrong legal standard. If Williams was not "replaced" and her position was indeed eliminated for "business considerations" then the fourth element is modified requiring Williams to "provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her out] for discharge for impermissible reasons." *Rachells*, 732 F.3d at 661. Assuming without deciding that the standard EKU cites is sufficient, it still applied the wrong definition of "similarly situated," which resulted in a curt recitation of the "relevant" facts.

---

> An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.
>
> *Barnes*, 896 F.2d at 1465.

In summary, EKU cannot insist that Williams' position was eliminated for legitimate business reasons (*i.e.*, the declining economic success of phonathon fundraising strategies) while advocating for the law that applies when there is no workforce reduction based on "business considerations." Either Williams was eliminated because of a workforce reduction (or adjustment) and those elements apply, or she was terminated and replaced and the elements EKU produced apply.[2] [*See* n. 1 above.] To be fair, Williams *does* argue that she was replaced and that the "reorganization" was merely a strategy to impermissibly terminate her. [*See* Record Nos. 1-1 at 9 and 43-16 at 6.] But that allegation is more properly characterized as pretext for EKU's stated legitimate business reason—rather than an element of her *prima facie* claim. *See Jackson*, 518 F.3d at 396 (explaining that the district court's fact intensive inquiry on an element of the plaintiff's *prima facie* claim was "misplaced" and that type of analysis was more appropriate in determining pretext).

The threshold question is whether Williams was terminated in the context of a workforce reduction. *Geiger*, 579 F.3d at 623. Here, the claim at issue is properly characterized as one pertaining to a workforce reduction because "business considerations" caused EKU to eliminate Williams' position along with two other vacant positions and to reclassify several other positions within the department. *Barnes*, 896 F.2d at 1465. The reasons proffered include to "improve its efficiency and service capabilities," "innovate . . . and further EKU's strategic plan," "expand into a more sophisticated, digital engagement approach," and redirect efforts directed at traditional phone-based fundraising, which "had

---

[2] The undersigned acknowledges the difficulty created when a plaintiff, proceeding *pro se*, fails to respond to a dispositive motion. However, the movant's duty remains the same: it must show there is no genuine dispute as to any material fact. To rule in the movant's favor, the Court's role nonetheless is the same: it must determine that the movant discharged that burden.

- 9 -

seen a dramatic decline in the amount of money raised." [Record No. 43 at 9–10] If, instead, the reorganization was a workforce adjustment and not a workforce reduction, the analysis remains the same. *Jackson*, 518 F.3d at 396.

Such a *prima facie* claim requires Williams to show that she was: "(1) a member of a protected class; (2) discharged; (3) qualified for the position; and (4) that a 'similarly situated' non-protected person was treated better." *Rachells*, 732 F.3d at 661 (citing *Mitchell*, 964 F.2d at 582). A claim based on a termination arising out of a workforce reduction, modifies "the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Geiger*, 579 F.3d at 622–23 (quoting *Barnes*, 896 F.2d at 1465). This modification requires identifying the group of employees to whom the plaintiff should be compared (*i.e.*, "comparable employees"). *Rachells*, 732 F.3d at 661–62.

EKU does not contest the first three elements, which are identical to the ones they cited for a termination claim not based on a workforce reduction. [*See* Record No. 43 at 6.] While EKU spends some time discussing "similarly situated," it applies the wrong definition when doing so. *Id.* at 7 (citing *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) EKU argues that because Williams was the only Development Associate, there simply are no similarly situated employees nor were there any substantially similar positions; and therefore, her claim must fail. [Record No. 43 at 6] Such a narrow reading of "similarly situated" functionally removes Williams from the protective reach of Title VII and has been disclaimed by Sixth Circuit precedent. *See e.g., Jackson*, 518 F.3d at 394, 396–97; *Ercegovich*, 154 F.3d at 352–53.

The panel in *Ercegovich v. Goodyear Tire & Rubber Company* circumscribed the "similarly situated" definition outlined in *Mitchell v. Toledo Hospital* and its progeny.[3] In *Ercegovich*, the panel reiterated that *Mitchell* stood for the proposition that the plaintiff has the burden to show "she was subjected to different treatment than persons similarly situated in all relevant aspects," but then noted that in *Mitchell*, the context was *employee discipline*. *Ercegovich*, 154 F.3d at 352. With this background, the panel reversed the trial court's grant of summary judgment finding that the plaintiff demonstrated he was similarly situated in "all the relevant aspects" to other employees despite holding *different* positions. *Id.* at 353. It reasoned that because the other employees, who were similarly affected in the reorganization of the department, were all in related human resources positions—they were "sufficiently similarly-situated" to the plaintiff. *Id.*

Because Williams' case is more like *Ercegovich* (involving a reorganization) and less like *Mitchell* and *Johnson* (involving employee discipline) the analysis in *Ercegovich* applies. As noted in *Ercegovich* and other cases, "the purpose of Title VII [is] not served by an overly narrow application of the similarly situated standard," and such an arduous standard may not functionally remove a plaintiff with a "unique position . . . from the protective reach of the antidiscrimination laws." *Jackson*, 518 F.3d at 396–97 (citing *Ercegovich*, 154 F.3d at 353).

Despite stating Williams did not have a *prima facie* claim, EKU still, however, proffered a sufficient legitimate, nondiscriminatory reason for Williams' termination. [Record

---

[3] "Thus, to be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

No. 43 at 2 (explaining that the position was eliminated because phone-based fundraising was no longer viable)] Regarding pretext, Williams in her Complaint addendum and Initial Disclosure offers evidence undermining EKU's proffered legitimate, nondiscriminatory reason for her termination. [Record Nos. 1-1 and 43-26] Williams first contends that her position as Development Associate was eliminated under the guise of "reorganization" when in fact the Digital Engagement Officer ("DEO") job duties "mirrored [her] exact annual job performance goals" at the time of her termination" in which she was deemed "Highly Effective." [Record Nos. 43-16 at 6; *compare* 43-34 at 8–11 *with* 43-6] She insists that her Development Associate job description was no longer accurate in 2022. [Record Nos. 23 at 2 ("[A]dditional roles and goals were added over time.") and 43-16 at 6]

To support her claim that she had been tasked with leading the transition of phonathon to the Digital Engagement Center ("DEC"), she references a 2022 email with the subject name "Mid-Year Check In" with Rhodus in which Rhodus outlined Williams' goals and her progression of such. [Record Nos. 43-16 at 5 and 43-34 at 9–10] The stated goals include "Lead EKU Digital Engagement Center Transition" and "Increase Digital Engagement Center Fundraising" [Record No. 43-34 at 9–10] There is no mention of these goals or tasks in her 2017 Development Associate position summary, which was never modified during her tenure. [*See* Record No. 43-5 at 2.] Further, Williams contends that emailing, texting, calling, and video outreach predated the use of phonathons to raise funds; therefore, the rebranding of the phonathon into the DEC "simply groups all communication strategies with a few rebranded marketing pieces." [Record No. 43-16 at 6]

Next, regarding the declining funds raised by the annual phonathons, Williams suggests that the real reasons for the decline in raised funds attributed to her and the phonathon were

(1) COVID-19's limitations which affected the success of student callers; (2) the transition to a new fundraising system which caused a glitch preventing donor payments by credit cards for one year and five months; (3) Rhodus' decision, which Williams cautioned against, to change the final contact to an email from a mailer in the Six No Answer ("6NA") direct mail campaign; (4) the delayed responses from Maria Fore regarding annual scripting surveys; (5) the removal of 20,000 names from Williams' call list by Foulkes; and (6) the refusal to provide an appeal code for the $200,000 she helped raise for the Student Assistance Fund for Eastern Retention and Graduation ("SAFE"). [Record Nos. 1-1 at 8; 43-16 at 3–8 and 43-8 at 26–28]

Even if EKU had cited the proper elements for a *prima facie* termination case (and assuming Williams did have a *prima facie* claim), it still failed to discharge its burden because Williams provided sufficient evidence that EKU's proffered reasons are pretextual such that a "reasonable factfinder could find that the employer's proffered reason was insufficient to motivate the employee's discharge." *Clay*, 501 F.3d at 704; *Moore*, 113 F.4th at 623 (citing *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008)) (cleaned up).

Alternatively, by applying the wrong legal standard for a workforce reduction termination and applying an inapposite "similarly situated" definition, EKU has failed to discharge its burden on Williams' claim relating to her termination on October 7, 2022. However, EKU has discharged its burden on all the following claims: (1) failure to hire for the DEO position; (2) failure to hire for the Associate Director of Advising & Career; (3) failure to promote to higher positions or projects; (4) unequal terms of employment; (5) retaliation; and (6) hostile work environment.

**Failure to Hire**

To establish a *prima facie* claim for failure to hire, a plaintiff must demonstrate that (1) he or she was a member of a protected class; (2) he or she applied for and was qualified for the job; (3) despite his or her qualifications, he or she was rejected; and (4) following her rejection, the job remained open or was filled by someone outside of her protected class. *Blair*, 505 F.3d at 529 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), *holding modified on other grounds by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)); *George v. Youngstown State Univ.*, 966 F.3d 446, 470 (6th Cir. 2020). Once the plaintiff satisfies this burden, the burden shifts back to the employer to proffer a legitimate, non-discriminatory reason for not hiring the plaintiff. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *Burdine*, 450 U.S. at 254). To overcome the proffered reason and survive summary judgment, the plaintiff must produce evidence sufficient for a reasonable jury to find that the employer's stated reason is merely pretext for discrimination. *Levine*, 64 F.4th at 797 (citing *Burdine*, 450 U.S. at 253).

EKU first posted the DEO position on March 9, 2023, and made it available to internal candidates. [Record No. 43 at 10] Because Williams did not sign the severance agreement, which would have allowed her to be treated as an internal candidate for one year, she was unable to apply. *Id.* The position was released for external candidate applications on May 17, 2023, but Williams did not apply until June 28, 2023. *Id.* at 11. Williams has produced no evidence that the position remained open after she was rejected or that the position was filled by a person outside of her protected class. *Blair*, 505 F.3d at 529. Even assuming she could satisfy that fourth element—her claim still fails.

EKU contends that by the time the search committee received Williams' application, it had already selected and began interviewing top candidates and was ready to make its final

- 14 -

recommendations. [Record No. 43 at 11] Additionally, Williams represented in her cover letter her former position as Digital Engagement Officer rather than Development Associate. *Id.* Williams suggests that the new hire Sidney Dixon may be related to John Dixon, Interim Title IX Coordinator, and Chief Human Resources Officer, which (if true) suggests nepotism and, therefore, implies that the proffered non-discriminatory reasons were merely pretext for discrimination. [Record No. 43-16 at 9] But without more, this bare allegation is insufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Williams' failure to hire claim for the Associate Director of Advising and Career Services position likewise fails. Williams concedes that she did not have the requisite one-year experience in career services to be qualified for the position but insists that EKU should have trained her for the position. [Record No. 43-7 at 125–28] However, employers are free to choose among qualified candidates. *Levine*, 64 F.4th at 798. The candidate EKU selected "had over 30 years of experience in higher education administration and nearly 20 years in career development." [Record No. 43 at 13] Williams has not and cannot show that she was "significantly better qualified" than the selected candidate. *Levine*, 64 F.4th at 798.

### Failure to Promote

All of Williams' failure to promote claims related to positions she applied for while employed by EKU are barred by the statute of limitations under 42 U.S.C. § 2000e-5(e)(1) (*i.e.*, Director of Annual Giving (2019), Marketing Professor Facilitator (2021), Business Professor Facilitator (2021), Senior Programmer Analyst (2020)). [Record No. 12 at 4 n.2] Williams' other vague claims that she was denied opportunities or treated differently than her coworkers do not amount to *prima facie* claims. [*See* Record No. 1-1 at 9–10.] Perhaps these

allegations could suffice as pretext.  But that said, before pretext, Williams must show "(1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000) (cleaned up).  The main roadblock for Williams is with the second element because she has not shown she *applied for* (or even asked to participate in) these "higher positions [and] higher projects." [Record No. 43-7 at 112–13]

### Unequal Terms of Employment

Williams' claims involving unequal treatment by Mohler and Foulkes, who both left EKU in 2019, are time barred.  [*See* Record Nos. 12 at 4 ("[A]ny claims based on discrete incidents alleged to have occurred before July 15, 2022, are barred by statute of limitations set forth in 42 U.S.C. § 2000e-5(e)(1).") and 43 at 16–17.]  And so are her claims that (1) she was the only one to receive an evaluation for 2018–2019; and (2) she had to train her supervisor Rhodus in 2019.  [Record Nos. 43-16 at 2 and 43-7 at 130]  Regarding the allegation that Rhodus and Gardner refused to provide her recommendation letters, Williams has provided no evidence to support this assertion.  [*See* Record No. 43-7 at 87–93.]  Further, she has conceded that providing such a letter is discretionary.  [Record Nos. 43-7 at 93 and 43-16 at 2]

### Retaliation

Title VII's anti-retaliation provision "'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'"  *Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 639 (6th Cir. 2009) (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  To establish a *prima facie* claim of retaliation, the plaintiff must

show "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Garner*, 554 F.3d at 639 (citing *Morris v. Oldham Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). In this context, an adverse employment action that a reasonable employee would find materially adverse is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Garner*, 554 F.3d at 639 (quoting *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68. "A mere inconvenience or an alteration of job responsibilities is not enough to constitute an adverse employment action." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc)) (internal quotations omitted). Satisfying the fourth element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013).

The parties do not contest that Williams participated in a protected activity when she reported alleged discriminatory treatment from Mohler in 2018. [Record No. 43-16 at 2] However, Williams has not provided any proof of a causal connection between her termination and engaging in that protected activity. Both Mohler and Foulkes left EKU in 2019, and her termination occurred nearly four years after her report. To the extent that Williams' "pattern of sabotage" allegations may be construed as retaliation—they still fail. She alleges the following examples of sabotage: Fore "rarely responding" in a timely manner to Williams'

requests, Rhodus refusing fund tracking on the Student Assistance Fund for Eastern Retention and Graduation ("SAFE"), and Rhodus transitioning the Six No Answer ("6NA") final contact from direct mail to email. [Record No. 43-16 at 3–4] Not only do these instances not amount to adverse employment actions or severe or pervasive retaliatory harassment, but Williams has not shown that Fore or Rhodus *knew* she engaged in a protected activity in 2018. *See Garner*, 554 F.3d at 639.

### Hostile Work Environment

To establish a *prima facie* claim, the plaintiff must produce evidence that "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)). The type of harassment necessary to support a hostile work environment claim, must create a workplace that is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citation omitted); *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). Factors courts consider in determining whether an environment is hostile or abusive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Harris,* 510 U.S. at 23; *Randolph v. Ohio Dep't of Youth Services,* 453 F.3d 724, 733 (6th Cir. 2006).

As previously discussed, Williams' claims against Mohler and Foulkes are time barred. Aside from the many deficiencies in Williams' hostile work environment claim, nothing she alleges, regarding the way Fore (providing information in a dilatory fashion) and Rhodus (modifying the 6NA's final contact and not providing appeal codes for SAFE), rises to the level of harassment contemplated by Title VII. [Record No. 43-16 at 3–4] *See Harris*, 510 U.S. at 21.

## IV. Conclusion

Based on the foregoing discussion and analysis, it is hereby

**ORDERED** that Defendant Eastern Kentucky University's Motion for Summary Judgment [Record No. 43] is **DENIED** with respect to Plaintiff Williams' claim of wrongful termination. The motion [Record No. 43] is **GRANTED** with respect to Plaintiff Williams claims of failure to hire, failure to promote, unequal term of employment, retaliation, and hostile work environment.

Dated: December 18, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky